**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:   CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

**TITLE:      Flynn v. Sientra, Inc. et al.**

==========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                              Not Present
Courtroom Clerk                               Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**          **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                   Not Present

==========================================================================
**PROCEEDINGS (in chambers):   ORDER GRANTING IN PART AND DENYING IN PART SIENTRA DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT** [Docket No. 72]**; GRANTING IN PART AND DENYING IN PART UNDERWRITER DEFENDANTS' MOTION TO DISMISS AND JOINDER IN SIENTRA DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT** [Docket No. 82]

These matters are before the Court on (1) Defendants Sientra, Inc. ("Sientra"), Hani Zeini, Matthew Pigeon, Nicholas Simon, R. Scott Greer, Kevin O'Boyle, and Jeffrey Nugent ("Sientra Defendants") Motion to Dismiss the Consolidated Amended Complaint ("Sientra Motion"), filed March 21, 2016; and (2)  Defendants Piper Jaffray & Co., Stifel, Nicolaus & Company, Incorporated, Leerink Partners LLC and William Blair & Company, L.L.C. ("Underwriter Defendants") Motion to Dismiss and Joinder in Sientra Defendants' Motion to Dismiss Consolidated Amended Complaint ("Underwriter Motion"), filed March 22, 2016.  Plaintiffs John M. Flynn ("Flynn") and Quad Development LLC ("Quad") (together, "Plaintiffs") opposed the Sientra Motion ("Sientra Opposition") and Underwriter Motion ("Underwriter Opposition") on April 20, 2016.  Sientra Defendants and Underwriter Defendants (together, "Defendants") replied in support of their motions ("Sientra Reply" and "Underwriter Reply," respectively) on May 5, 2016. The Court found these matters suitable for disposition without oral argument and vacated the hearings set for June 13, 2016.  *See* Fed. R. Civ. P. 78(b).  For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART**  the Sientra Motion and **GRANTS IN PART** and **DENIES IN PART** the Underwriter Motion.

I.      FACTUAL AND PROCEDURAL HISTORY

        A.      Factual Background

Plaintiffs bring this securities class action against Sientra and certain of its officers, directors, and underwriters on behalf of themselves and all other persons who purchased or otherwise acquired Sientra securities (1) pursuant and/or traceable to Sientra's Registration Statement and Prospectus ("Registration Statement") issued in connection with Sientra's secondary public offering on or about September 18, 2015 (the "SPO") (the "Securities Act Class"); or (2) between

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 15-07548 SJO (RAOx)**         DATE:   **June 9, 2016**

May 14, 2015 and October 28, 2015, inclusive (the "Class Period") (the "Exchange Act Class"). (Consol. Am. Compl. for the Violation of the Federal Securities Laws ("CAC") ¶ 1, ECF No. 56.) Plaintiffs, who claim to have purchased Sientra securities during the Class Period, (*see* CAC ¶¶ 26-27), allege the following in their CAC, filed February 19, 2016.

Sientra is a medical aesthetics company that develops and sells medical aesthetics, including silicone gel breast implants and breast tissue expanders, to plastic surgeons. (CAC ¶ 2.) Sientra was incorporated in Delaware in 2003 as Juliet Medical, Inc., and changed its name to Sientra, Inc. in 2007 after obtaining venture capital financing. (CAC ¶ 51.) Sientra's founders sought to enter the U.S. market and break the then-existing duopoly of breast implant manufacturers in the U.S., consisting of Mentor and Allergan. (CAC ¶ 53.)

The exclusive manufacturer of Sientra's products is Silimed Indústria de Implantes Ltda. ("Silimed"), a Brazilian company that is the largest manufacturer of silicone implants in South America. (CAC ¶¶ 3, 61.) Sientra acquired Silimed's U.S. subsidiary, Silimed, Inc., in April 2007, and gained rights to silicone breast implant clinical trials. (CAC ¶ 52.) Sientra announced on March 9, 2012 that it had received approval from the U.S. Food & Drug Administration ("FDA") to sell its portfolio of Silimed-brand silicon breast implants. (CAC ¶ 54.) Sientra completed an initial public offering ("IPO") at a price of $15 per share on November 3, 2014, raising net proceeds of over $77 million. (CAC ¶ 55.)

Notwithstanding raising $69 million from its IPO, throughout the Class Period, Sientra was in a negative cash position. (CAC ¶ 6.) Moreover, Sientra was subject to a term loan agreement with Oxford Finance LLC ("Oxford") for approximately $24.5 million, which was at risk of default by Sientra. (CAC ¶¶ 6, 60.)

Quality control is particularly critical in the silicone implant industry, with serious implications for consumer safety. (CAC ¶ 49.) Indeed, Sientra has a Quality Assurance team, whose duties and responsibilities include reviewing complaints that come in from patients and doctors about Sientra's Silimed-manufactured products and making judgments as to whether the complaints rose to the level of an adverse event under FDA or other applicable guidelines. (CAC ¶ 62.)

According to a German newspaper report, in 2014, the FDA received an anonymous report stating that breast implants manufactured by Silimed in its Rio De Jainero plant were contaminated with foreign particles. (CAC ¶ 68.) In the spring of 2015, the Bundesinstitut für Arzneimittel und Medizinprodukte ("BfArM"), the German regulator of the health industry, received an anonymous report stating that breast implants manufactured by Silimed in Rio were contaminated with particulates, including silver. During the summer of 2015, BfArM engaged TÜV SÜD, a well-known industrial and medical inspection entity, to investigate these allegations, and this group inspected Silimed's manufacturing plant and "established that the surfaces of some devices were contaminated with particles." (CAC ¶¶ 7, 70-73.) An internal investigation by Silimed that

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  **CV 15-07548 SJO (RAOx)**          DATE:  **June 9, 2016**

concluded on or before September 4, 2015 confirmed the presence of particle contamination on the surface of breast implants sold in the United States by Sientra.  (CAC ¶¶ 7, 74.)

Notwithstanding being aware of the aforementioned regulatory and internal findings, which "threatened Sientra's core operations," Defendants recklessly continued with the SPO, and with the help of Sientra's underwriters, undertook the SPO between **September 14, 2015** and **September 23, 2015** that raised more than $65 million, before underwriter expenses, to insulate the Company "against the coming turmoil and allowed it to stay afloat."  (CAC ¶¶ 8, 75-76.)  In particular, Hani Zeini ("Zeini"), then Sientra's Chief Executive Officer, responded to the SEC's September 14, 2015 letter informing Sientra that "we have not reviewed and will not review your registration statement" by requesting acceleration of the effective date of the Registration Statement to September 17, 2015 at 4 p.m.  (CAC ¶ 78.)  Underwriters Piper Jaffray & Co. ("Piper Jaffray") and Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") also wrote to the SEC on September 15, 2015, requesting the same acceleration.  (CAC ¶ 79.)  These accelerations were successful, and Sientra's Registration Statement for its SPO became effective at 4 p.m. on September 17, 2015.  (CAC ¶ 80.)

The **same day** that the SPO became effective, the Zentralstelle der Länder für Gesundheitsschutz bei Arzneimitteln Und Medizinprodukten ("ZLG"), the German central authority for health, disclosed and communicated to all twenty-seven (27) other EU state health authorities, including the United Kingdom's ("UK") Medicines and Healthcare Products Regulatory Agency ("MHRA"), that it was issuing a temporary, ninety day suspension of Silimed's CE Certificate of Conformity ("CE"), which permitted Silimed's goods to be sold throughout the European Union.  (CAC ¶¶ 10, 81.)  Sientra was aware of the importance of both the European market and the importance of CE conformity for being able to sell products in that market.  (CAC ¶ 86.)

On September 18, 2015, Sientra's Registration Statement was filed with the SEC, with the SPO priced at $22 per share, a price per share well above Sientra's $15 per share IPO price offered less than a year earlier.  (CAC ¶ 90.)  On September 23, 2015, Sientra issued a press release announcing the closing of its SPO, raising net proceeds of $61.4 million.  (CAC ¶ 91.)  Just minutes after the SPO closed, the UK's MHRA issued a press release announcing the suspension of sales and implanting in the UK of all medical devices manufactured by Silimed due to the widespread  contamination of Silimed's implant products, including those manufactured in the same facility that manufactured products for Sientra.  (CAC ¶¶ 9, 91.)  As a result of this news, which was disseminated by a number of U.S. sources, including Sientra, on September 24, 2015, shares of Sientra fell $10.88 per share, or nearly 53%, to close at $9.70 per share on September 24, 2015.  (CAC ¶¶ 11, 92, 133.)

More turmoil was to follow.  Between **September 28** and **30**, 2015, Brazil's health regulator, ANVISA, together with the Health Surveillance Office of the State of Rio de Janeiro, performed inspections at the premises of Silimed, where several breaches of GMP were identified.  (CAC ¶ 136.)  As a result, the Health Surveillance Office ordered the suspension of the manufacturing

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**


**CASE NO.:   CV 15-07548 SJO (RAOx)**          **DATE:   June 9, 2016**


of all Silimed's products.  (CAC ¶ 136.)  On October 2, 2015, after the market closed ANVISA announced that while it was in the process of reviewing the technical compliance related to the manufacturing process of Silimed's manufacturing facility, due to the recently announced suspension of the CE certificate, ANVISA was temporarily suspending the manufacturing and shipment of all medical devices made by Silimed, including products manufactured for Sientra. (CAC ¶¶ 12, 137.)  On the next trading day, October 5, 2015, before the market opened, Sientra revealed that the Brazilian regulatory authorities, including ANVISA, were reviewing "the technical compliance related to GMP ['Good Manufacturing Practices'] of Silimed's manufacturing facility," and further indicated that it "continue[d] to be in active discussions with the [FDA] regarding this matter."  (CAC ¶¶ 13, 139.)  On the news that the contamination at Silimed was more widespread than previously thought, from the Company's disclosures on October 2, 2015 after the close of the market and the next trading day before the market opened, the market reacted negatively, causing Sientra shares to slide, once again, to $8.18 per share on October 5, 2015, or a loss of 21%. (CAC ¶¶ 14, 140.)

The market was still unaware of the full extent of Silimed's quality control issues, "since [Sientra] did not disclose that this would affect its current sales in the United States."  (CAC ¶ 14.)  On October 9, 2015, after the market closed, Sientra announced that it had suspended the sale of all devices manufactured by Silimed, and recommended that plastic surgeons discontinue implanting such devices until further notice.  (CAC ¶ 15.)  In the wake of this disclosure, the market learned that the qualities issues present at Silimed were more widespread than previously thought, and on this news, Sientra shares further decreased by 12.5% to close at $6.13 per share on October 12, 2015, the next trading day.  (CAC ¶ 16.)

On October 27, 2015, Sientra disclosed that Oxford had issued a notice indicating that "in connection with the recent events involving Silimed and [Sientra], certain events of defaults have occurred and continue to exist under the Loan Agreement."  (CAC ¶ 147.)  Nevertheless, on October 28, 2015, "flush with proceeds from the SPO," Sientra "repaid all principal, interest, other amounts and obligations owed to Oxford under the term loans for a total of $24.5 million, following which the Company purportedly has no outstanding debt obligations."  (CAC ¶ 147.)

Also on October 28, 2015, after the close of the market, Zeini, revealed that Sientra's regulatory review was related to "GMP nonconformities that resulted in the hold placed on the Silimed-manufactured products."  (CAC ¶ 17.)  On this news, "the full risk of Sientra's quality control issues had fully materialized," and Sientra shares fell another 18% to close at $3.92 per share on October 29, 2015.  (CAC ¶ 18.)  On November 12, 2015, "as a result of Sientra's misrepresentations and omissions concerning these critical facts," Zeini was forced to step down as CEO.  (CAC ¶ 19.) On or about January 8, 2016, the UK's MHRA announced that the CE suspension of SIlimed's products for Europe would be extended until the end of June 2016.  (CAC ¶ 20.)

During the Class Period, (1) Matthew Pigeon ("Pigeon") served as Sientra's Treasurer and Chief Financial Officer; (2) Nicholas Simon ("Simon") served as its Chairman of the Board and as a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 15-07548 SJO (RAOx)**          DATE:   **June 9, 2016**

director; and (3) Timonthy Haines ("Haines"), R. Scott Greer ("Greer"), Kevin O'Boyle ("O'Boyle"), and Jeffrey Nugent ("Nugent") (together with Zeini, "Individual Defendants") served as directors.[1] (CAC ¶¶ 29-35.)   Piper Jaffray and Stifel Nicolaus were two of the primary underwriters of Sientra's SPO, assisted in the preparation and dissemination of materials in connection with the SPO ("Offering Documents"), and acted as representatives for all of the underwriters involved in the SPO. (CAC ¶¶ 36-37.)  Leerink Partners LLC ("Leerink") and William Blair & Company, L.L.C. ("William Blair") were also underwriters of Sientra's SPO and assisted in the preparation of the Offering Documents.  (CAC ¶¶ 38-39.)

> B.       Allegations Regarding Materially False and Misleading Statements

Sientra filed a quarterly Form 10-Q report with the SEC on May 14, 2015 reiterating the financial and operating results previously announced in its Q1 2015 8-K (the "Q1 2015 10-Q").  (CAC ¶ 99.) The Q1 2015 10-Q stated, in relevant part, that certain risks that could impair Sientra's financial condition included (1) Silimed manufacturing products not in compliance with regulatory requirements; (2) Silimed failing to follow GMP; (3) latent defects that may become apparent after their release; and (4) unanticipated complications.  (CAC ¶¶ 100-102.)

Moreover, on August 12, 2015, SIentra held an earnings call in advance of the announcement of its Q2 2015 financial and operating results.  (CAC ¶ 107.)  During the call, Zeini stated that Sientra

> ha[s] had this long-term relationship with Silimed and the individuals and the owners of Silimed, both at the professional and personal level.  We have a fantastic partnership that we are both of value to each other.  And I do not know today of any reason why that value is different or changing . . . .

(CAC ¶ 108.)  Similar statements to those contained in the Q1 2015 10-Q were contained in Sientra's August 13, 2015 Q2 2015 10-Q.  (CAC ¶ 111-116.)

The Registration Statement incorporated by reference Sientra's Form 10-K for the year ending December 31, 2014 ("2014 10-K"), as well as the Q1 2015 10-Q and Q2 1015 10-Q.  (CAC ¶ 119.) The Registration Statement stated, in part, that certain risk factors, including (1) Sientra's "rel[iance] on a foreign, sole source, third-party to manufacture and supply our silicone gel breast implants . . . [;]" (2) the "inherent risks in contracting with manufacturers located outside of the United States such as in Brazil;" and (3) "various factors outside our direct control may adversely affect manufacturing and supply of our breast implants, tissue expanders and other products[.]" (CAC ¶ 120.) Moreover, the 2014 10-K provides, among other things, (1) that Sientra is "primarily responsible for the manufacturing and quality assurance of [Sientra's] products[;]" and (2) that

---

[1]  Simon resigned as Sientra's Chairman on November 12, 2015, and was succeeded by Nugent.  (CAC ¶¶ 31, 35.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  **CV 15-07548 SJO (RAOx)**          DATE:  **June 9, 2016**

when Sientra "receive[s] products from Silimed, [it] inspect[s] the products prior to shipping them to [its] customers."  (CAC ¶ 123.)

### C.      Plaintiffs' Causes of Action

In the CAC, Plaintiffs assert the following five causes of action:  (1) violation of section 11 of the Securities Act against all Defendants ("Section 11 Claim"); (2) violation of section 12(a)(2) of the Securities Act against all Defendants ("Section 12 Claim"); (3) violation of section 15 of the Securities Act against both the Individual Defendants and the Underwriter Defendants ("Section 15 Claim"); (4) violation of section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Sientra, Zeini, and Pigeon ("Rule 10b-5 Claim"); and (5) violation of section 20(a) of the Exchange Act against Zeini and Pigeon ("Section 20 Claim").  (*See generally* CAC.)

### II.      DISCUSSION

In the Sientra Motion, Sientra Defendants argue that Plaintiffs' causes of action be dismissed pursuant to Rules 8, 9, and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.*  (*See generally* Mem. Ps. & As. in Supp. Sientra Mot. ("Sientra Mem."), ECF No. 72-1.)  In particular, Sientra Defendants argue that (1) Plaintiffs fail to adequately plead a false or misleading statement; (2) Plaintiffs fail to adequately plead scienter; (3) Plaintiffs fail to adequately plead loss causation; (4) Plaintiffs fail to adequately plead that Defendants are control persons; and (5) Plaintiffs fail to allege predicate claims necessary to establish control person liability.  (*See generally* Sientra Mem.)[2]

In the Underwriter Motion, Underwriter Defendants join in the Sientra Motion and independently argue (1) that Plaintiffs' Section 11 and 12 Claims must be dismissed for lack of standing; and (2) Plaintiffs' Section 15 Claim must be dismissed because the CAC does not contain any allegations against Underwriter Defendants.  (*See generally* Mem. Ps. & As. in Supp. Underwriter Mot. ("Underwriter Mem."), ECF No. 82-1.)

///
///
///
///

### A.      Legal Standards

---

[2]  Neither Sientra Defendants nor Underwriter Defendants challenge the materiality of the information allegedly disclosed or withheld.  (*See generally* Sientra Mem.; Underwriter Mem.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)          DATE:   June 9, 2016**

1.      Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Rule 12(b)(6), which provides for dismissal of a plaintiff's cause of action for "failure to state a claim on which relief can be granted," *see* Fed. R. Civ. P. 12(b)(6), must be read in conjunction with Federal Rule of Civil Procedure 8(a) ("Rule 8").  *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Rule 8 requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although the pleader is not required to plead "detailed factual allegations" under Rule 8, this standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Pleadings that contain nothing more than legal conclusions or "a formulaic recitation of the elements of a cause of action" are insufficient.  *Id.* (citation and quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Where a complaint pleads sufficient facts "to raise a right to relief above the speculative level," a court may not dismiss the complaint under Rule 12(b)(6).  *See Twombly*, 550 U.S. at 545.  In reviewing a motion to dismiss under Rule 12, a court may only consider the complaint, documents incorporated by reference in the complaint, and matters of judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

2.      Particularity Under Rule 9(b) and the PSLRA

"Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.* ("*OPERF*"), 774 F.3d 598, 604 (9th Cir. 2014).  Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

Moreover, "the enactment of the [PSLRA] in 1995 significantly altered pleading requirements in private securities fraud litigation by amending the 1934 Exchange Act to require that a complaint 'plead with particularity both falsity and scienter.'"  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)).  A securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Gompper*, 298 F.3d at 895 (quoting 15 U.S.C. § 78u-4(b)(1)).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)          DATE:   June 9, 2016**

The complaint must also "state with particularity facts giving rise to a **strong** inference that the defendant acted with the required state of mind."  *Id.* (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (facts must come closer to demonstrating intent as opposed to mere motive and opportunity). "The stricter standard for pleading scienter naturally results in a stricter standard for pleading falsity, because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys.*, 411 F.3d at 1015 (citations and internal quotation marks omitted). "Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Id.* (citing *Silicon Graphics*, 183 F.3d at 974).

3.      Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated under the authority of section 10(b), in turn, provides:

> It shall be unlawful for any person . . .
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) and Rule 10b-5 create a private right of action "which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  "The basic elements of a Rule 10b-5 claim, therefore, are:  (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys.*, 411 F.3d at 1014 (citing *Dura Pharms.*, 544 U.S. at 336).

"It is well established that claims brought under Rule 10b-5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)" and the PSLRA.  *Id.* (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)); *OPERF*, 774 F.3d at 604 (9th Cir. 2014).

4.      Sections 11 and 12(a)(2) of the Securities Act

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

"Unlike section 10(b) [of the Exchange Act], section 11 of the 1933 Securities Act creates a private remedy for any purchaser of a security if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Daou Sys.*, 411 F.3d at 1027 (quoting 15 U.S.C. § 77k(a)). "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) (citation and internal quotation marks omitted). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *Id.* (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S. Ct. 683 (1983)).

"Section 12(a)(2) of the 1933 Securities Act imposes civil liability on any person for use of any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes 'an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . .'" *In re Daou*, 411 F.3d at 1028-29 (quoting 15 U.S.C. § 77*l*(a)(2)). To establish liability under section 12(a)(2), a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain:

> The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale. The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, **motivated at least in part by a desire to serve his own financial interests or those of the securities owner**. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him. . . .

*Pinter v. Dahl*, 486 U.S. 622, 647, 108 S. Ct. 2063 (1988) (emphasis added).

Although sections 11 and 12(a)(2) do not contain an element of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint "sounds in fraud":

> [T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  Section 11 and 12(a)(2) claims "sound[ ] in fraud" where there is "obvious overlap" between the plaintiff's section 10(b) allegations and her section 11 and 12(a)(2) allegations.  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010) (holding that where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, the court 'can assume that it sounds in fraud.'").

In a case where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  *See id.* at 1105.  "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."  *Id.*

> 5.  Section 15 of the Securities Act and Section 20(a) of the Exchange Act

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12."  *In re Daou Sys.*, 411 F.3d at 1029 (citing 15 U.S.C. § 77*o*).  Section 15(a) provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77*k* or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*.

Similarly, section 20(a) of the 1934 Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [chapter 2B] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

///

> B.  Consideration of Documents Not Attached to the CAC:  Incorporation by Reference and Judicial Notice

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)            DATE:  June 9, 2016**

Sientra Defendants ask the Court to consider in ruling on both the Sientra Motion and Underwriter Motion fourteen (14) documents not attached to the CAC either under the incorporation by reference doctrine or by taking judicial notice of certain categories of documents. (*See* Req. for Consideration of Documents Incorporated into the CAC and for Judicial Notice in Supp. Sientra Mot. ("RJN"), ECF No. 73.) Of these documents, which are attached as exhibits to a supporting declaration, (1) Exhibits 1-5, 7-9, 11-12, and 14 are copies of documents publicly filed with the SEC; (2) Exhibit 13 is a printout of a publicly available Sientra earnings call transcript that is quoted in the CAC at paragraphs 108 and 109; (3) Exhibit 6 is a copy of the MHRA's September 23, 2015 press release titled "Suspension of devices manufactured by Silimed" that is cited at paragraph 92 of the CAC; and (4) Exhibit 10 is a copy of a report from Exponent prepared for Silimed titled "Toxicological Risk Assessment of Foreign Material Detected on SILIMED Silicon Breast Implants" dated October 14, 2015 that is cited at paragraph 71 of the CAC. (*See* RJN; Decl. Ryan E. Blair in Supp. Sientra Mot. ("Blair Decl."), ECF No. 72-2.) Sientra Defendants also provide, "solely for the Court's convenience," two charts, attached as Exhibits 15 and 16 to the Blair Declaration, which purport to (1) summarize the contents of Sientra's April 30, 2015 proxy statement and provide "an explanation of how Defendants calculated certain figures (Exhibit 15)[;]" and (2) collect "the statements Plaintiffs allege were fraudulent and misleading (Exhibit 16)." (RJN 6 n. 2.)

Plaintiffs do not dispute that the Court can consider a number of these documents—in particular the SEC filings, press releases, and conference call transcripts and the Exponent Report—in ruling on the motions, but contend that the Court should not take notice of the statements "for the purpose of determining the truth of any of those statements." (Pls.' Response & Objs. to RJN ("RJN Opp'n"), ECF No. 85.) Plaintiffs also contend that the Court should disallow the introduction of Exhibits 15 and 16, as these charts are "cumulative of the information that the Court may independently consider." (RJN Opp'n 3 [quoting *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1122 n. 5 (S.D. Cal. 2012)].)

The Court finds consideration of Exhibits 1-14 for the purpose of ruling on the Sientra and Underwriter Motions to be proper. All fourteen Exhibits either are referenced in the CAC or are publicly available documents filed with the SEC, making judicial notice of these documents proper pursuant to Federal Rule of Evidence 201. *Silicon Graphics*, 183 F.3d at 986 (considering SEC filings in a motion to dismiss under the doctrine of incorporation by reference); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996) (proper to consider prospectus though not mentioned in complaint alleging violations of securities laws); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) ("[C]ourts must consider the complaint in its entirety , as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). The Court does not consider these documents in order to determine the "truth" of the statements contained therein, but instead considers the entirety of these documents to determine what statements were made and how these statements relate to the other allegations in Plaintiffs' CAC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 15-07548 SJO (RAOx)**            DATE:   **June 9, 2016**

Moreover, the Court finds consideration of Exhibits 15 and 16 to be proper.  Plaintiffs do not challenge the accuracy of these charts, but instead contend that the Court should disregard them because the information in these charts is "cumulative" of other information the Court may consider.  (RJN Opp'n 3.)  The Court finds the reasoning in *DeMarco v. DepoTech Corp.* to be persuasive, and finds that it "may consider the chart[s] because [they are] simply a collection of quotations [and other information] from documents the Court may independently consider for the reasons expressed above."  149 F. Supp. 2d 1212, 1218 (S.D. Cal. 2001).

    C.    <u>Analysis</u>

        1.    <u>False or Material Misrepresentation or Omission</u>

Sientra Defendants first argue that Plaintiffs fail to allege in the SAC any specific facts showing a material misrepresentation or omission. (Sientra Mem. 8.)  Sientra Defendants contend that the CAC is an impermissible "puzzle pleading," which places the burden on the reader "to solve the 'puzzle' of interpreting Plaintiffs' claims," and more fundamentally posit that Plaintiffs have not pled any facts to show that Defendants made any actionable misrepresentations or omissions. (Sientra Mem. 8 [quoting *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008)].)  The Court addresses these two arguments in turn.

           a.    <u>Plaintiffs' CAC Goes Beyond Mere "Puzzle Pleading"</u>

"In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998).  Sientra Defendants contend that the CAC is a "textbook example of 'puzzle pleading,'" citing to portions of the CAC in which Plaintiffs spend several pages quoting from Sientra's SEC filings without identifying any allegedly false statements, and then providing a page-long list of reasons why those statements were false or misleading. (*See* Sientra Mem. 8-9 [citing CAC ¶¶ 99-104, 106].)  Thus, Sientra Defendants argue that in order for a reader to determine whether any particular statement is allegedly false, she must (1) look first at the explanatory paragraph; (2) then "wade through the 'catalogue of statements' on the preceding pages;" (3) then return to the explanatory paragraph and guess at which of Plaintiffs' "reasons" might apply. (Sientra Mem. 9 [citing *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001)].)

Although the Court agrees with Sientra Defendants that the CAC could be arranged in a more straightforward manner, the Court does not find the allegations contained therein to present such a difficult "puzzle" that dismissal is warranted on this ground alone.  First, Sientra Defendants' argument regarding the **volume** of material the reader must digest before arriving at Plaintiffs' analysis as to why certain statements were false or misleading is unavailing.  These paragraphs are necessarily lengthy, as they contain direct quotations, without ellipses, from portions of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **CV 15-07548 SJO (RAOx)**          **DATE:**  **June 9, 2016**

Sientra's even more voluminous SEC filings.  (*See* CAC ¶¶ 99-104.)  Moreover, Plaintiffs highlight in bold and italics the **particular statements** in these filings that they shortly thereafter contend to be false or misleading.  (*See* CAC ¶¶ 99-104.)  Indeed, although Sientra Defendants appear to contend otherwise, Plaintiffs set forth with some degree of clarity in the succeeding paragraphs **why** the bolded and italicized statements were false and misleading.  (*See* CAC ¶¶ 106, 110, 118, 121, 128, 132.)  Unlike the 209-page CAC at issue in *Brosdky* that had "apparently random sentences bolded and italicized," 592 F. Supp. 2d at 1198, Plaintiffs' CAC "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" in a logical and organized fashion, 15 U.S.C. § 78u-4(b)(1).

Accordingly, the Court **DENIES** the Sientra Motion on this ground.

> b.       Plaintiffs Sufficiently Allege that Sientra Made Misleading Statements in the Registration Statement and Prospectus

Sientra Defendants next challenge Plaintiffs' allegations that the statements identified in the CAC are false or misleading.  Sientra Defendants principally argue that the "Risk Factors" identified in the SEC filings, which constitute all but three of the challenged statements, are "clearly not actionable," for these statements "'**disclosed precisely**' the risks of working with a foreign, sole-source manufacturer."  (Sientra Mem. 9-10 [emphasis in motion].)  Moreover, Sientra Defendants argue that because Sientra' SEC forms expressly and repeatedly disclosed that Silimed "may not currently be or may not continue to be in compliance with all applicable regulatory requirements" —a disclosure omitted entirely from the CAC—the other statements in its SEC filings cannot be misleading.  (*See* Blair Decl., Ex. 1 at 25, Ex. 2 at 55, Ex. 3 at 83.)[3]

The Court disagrees, for Sientra's public statements "speak[ ] about the risks of [product contamination and failure to comply with GMP] in the abstract, with no indication that the risk[s] 'may already have come to fruition.'"  *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, *Maxtrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S. Ct. 1309 (2011).[4]

---

[3]  Sientra Defendants also challenge the implication that "Sientra was aware of but failed to disclose 'complications or health consequences' associated with its implants."  (Sientra Mem. 11.)  Plaintiffs do not respond to this challenge, and the Court agrees that there are insufficient factual allegations to support an inference that any statements regarding "health consequences" in any of Sientra's public statements were false or misleading.  The Court therefore **DISMISSES** Plaintiffs' claims to the extent they are premised on allegations that Defendants made misleading statements concerning "health consequences."

[4]  A number of cases cited by Sientra Defendants—including (1) *In re Turnstone Sys. Sec. Litig.*, No. C 01-1256 SBA, 2003 U.S. Dist. LEXIS 26709 (N.D. Cal. Feb. 4, 2003); (2) *In re Leapfrog Enters., Inc. Sec. Litig.*, No. C-03-05421 RMW, 2006 WL 2192116 (N.D. Cal. Aug.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)          DATE:  June 9, 2016**

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information[;]" rather, "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the basic circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 44, 131 S. Ct. at 1321 (citing 17 C.F.R. § 240.10b-5(b)). In order to be misleading, an incomplete statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) ("By omitting information regarding BP's detection of high corrosion levels, [defendant] affirmatively created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"). Whether an omission makes a statement misleading always depends on context, and "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015).

In this case, the Court finds Plaintiffs' allegations regarding Sientra's broad disclosure of certain "risks"—including the **possibilities** (1) that Sientra's "products **may not** be manufactured in accordance with agreed upon specifications or in compliance with regulatory requirements, or its manufacturing facilities **may not** be able to maintain compliance with regulatory requirements;" (2) that Silimed might "fail[ ] . . . to follow [GMP]; (3) that Silimed might "fail to adhere to QSR requirements [or] have significant non-compliance issues;" and (4) that there are "**inherent risks** in contracting with manufacturers located outside of the United States such as in Brazil," (CAC ¶¶ 100-101, 104, 112-113, 116, 120, 123 [emphasis added])—are more than plausibly misleading when viewed in conjunction with Plaintiffs' allegations that serious regulatory issues had already transpired by the time these statements were made and that Sientra, Zeini, and Pigeon knew or recklessly disregarded the existence of these issues, both of which are discussed in detail in Section II(C)(2), *infra*.[5] In particular, a number of these statements are contained in Sientra's

---

1, 2006); and (3) *Zeid v. Kimberley*, 930 F. Supp. 3d 431 (N.D. Cal. 1996)—predate *Siracusano* and are therefore inapposite. (*See* Sientra Mem. 10.) Sientra Defendant's post-*Siracusano* case, *Lloyd v. CVB Fin. Corp.*, is distinguishable in that the "risk factor" statements "were accompanied by information about [the defendant's] credit losses and charge-offs and a warning that '[w]e may be required to make additional provisions for loan losses and charge off additional loans in the future.'" 811 F.3d 1200, 1207 (9th Cir. 2016).

5   The Court agrees with Sientra Defendants insofar as they contend that Plaintiffs' allegations that Sientra failure to disclose "complications or health consequences"  is baseless because Plaintiffs do not allege any "health consequences" have resulted from the use of Silimed products. (*See* Sientra Mem. 11 [citing CAC ¶¶ 106, 118, 128].) Plaintiffs do not address this point in their oppositions. Sientra Defendants' remaining argument that Plaintiffs' challenge regarding the "fantastic partnership" between Sientra and Silimed tends to undercut the theory that Sientra "knew every detail of what was

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  **CV 15-07548 SJO (RAOx)**          DATE:  **June 9, 2016**

September 18, 2015 Prospectus, which was filed **after** the ZLG issued a ninety day suspension of Silimed's CE.  (CAC ¶¶ 81-85, 130-131.)[6]

Thus, this case is readily distinguishable from cases cited by Sientra Defendants.  For example, in *Jasin v. Vivus, Inc.*, the district court, in an order which has since been appealed, rejected plaintiffs' general allegations that Vivus "insufficiently disclosed [the European Union's regulatory agency's] concerns about [a drug's] side effects, stability, and off-label uses in its annual 10-K and quarterly 10-Q forms," holding that such "cautionary statements . . . were non-actionable under the PSLRA's safe harbor . . . [and] were not misleading."  No. 14-cv-03263-BLF, 2016 WL 1570164, at *17-*18 (N.D. Cal. Apr. 19, 2016).  In contrast with this case, plaintiffs did not allege that Vivus knew, for example, that the regulator would not approve the drug in question.

Similarly, in *Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc.*, the Eighth Circuit Court of Appeals rejected plaintiff's argument "that a pattern of disclosure may spawn a duty to disclose," and further contended that even if such a duty were to exist, the plaintiff had not alleged circumstances giving rise to such a hypothetical duty because defendant "warned investors its business was vulnerable to any disruption at [its facilities]." 641 F.3d 1023, 1029 (8th Cir. 2011).  *MEMC* is inapposite, however, for in that case there were no allegations that defendant disclosed the possibility its plants would face production problems while knowing that these risks had "come to fruition."

Moreover, in *Kairalla v. Advanced Medical Optics, Inc.*, this Court rejected plaintiff's claims (1) that defendants were under an obligation to disclose information in their possession indicating an association between defendants' contact lens solution and a particular eye disease; and (2) that defendants, by not disclosing that they were aware of adverse information regarding the solution in a number of conference calls and press releases, made misleading statements.  No. CV 07-05569 SJO (PLAx), 2008 WL 2879087, at *3-*6 (C.D. Cal. June 6, 2008).  Unlike in this case, however, the plaintiff in *Kairalla* did not allege that defendants publicly expressed any connection between the solution and the eye disease.

Sientra Defendants attempt to distinguish *Siracusano v. Matrixx Initiatives, Inc.* by arguing that unlike in that case, where the defendants "spoke of the risk of product liability actions . . . without revealing that a lawsuit had already been filed," the disclosures challenged by Plaintiffs focus on

---

happening half a world away in Rio de Janeiro," (Sientra Mem. 12), is discussed in Section II(C)(2), *infra*.

[6]  To the extent Sientra contends that it did not know about contamination at the Silimed plant prior to filing the Registration Statement and Prospectus, this would appear to render the statement in Sientra's 2014 10-K that "[w]hen we receive products from Silimed, we inspect the products prior to shipping them to our customers" either false or misleading. (CAC ¶ 123.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)          DATE:  June 9, 2016**

"risks of loss to Sientra **that had yet to transpire**—*e.g.*, the possibility of delayed shipments, increased costs, impaired sales, supply problems, recalls, and unforeseen health consequences." (Sientra Reply 2, ECF No. 87.)  The Court does not find this distinction, to the extent it can be characterized as one, to be persuasive.  In this case, Plaintiffs allege that Sientra publicly spoke of the "risks" of Silimed's failure to comply with regulations and GMPs while knowing that Silimed, its sole manufacturer, had been found by a number of agencies to have violated such rules.  That Sientra had not yet felt the **loss** resulting from Silimed's regulatory shortcomings when it allegedly made these statements does not make the statements any less misleading.

For reasons discussed in greater detail below, however, the only public statements made by Defendants for which there is a "strong inference" that Defendants intentionally or recklessly omitted material information are contained in the Registration Statement and Prospectus, as these documents were filed in close proximity with the onset of regulatory activity concerning Silimed's manufacturing plant.  By contrast, Sientra's Q1 2015 10-Q and Q2 2015 10-Q, filed on May 14, 2015 and August 13, 2015, respectively, as well as their associated earnings calls, (*see* CAC ¶¶ 99, 107, 111), were filed well before Silimed's internal investigation confirmed the presence of particle contamination on the surface of breast implants and before the ZLG temporarily suspended Silimed's CE, (CAC ¶¶ 7, 74, 81).

Accordingly, the Court **GRANTS IN PART** the Sientra Motion and **DISMISSES** Plaintiffs' claims to the extent they are premised on (1) misrepresentations or omissions contained in Sientra's Q1 or Q2 2015 10-Qs; or (2) misrepresentations or omissions concerning health consequences. Dismissal is with leave to amend.  The Court **DENIES** the Sientra Motion to the extent Plaintiffs' claims are grounded in misrepresentations or omissions contained in Sientra's Registration Statement and Prospectus.

>        2.      Scienter

Sientra Defendants next argue that Plaintiffs fail to allege specific facts giving rise to a strong inference of scienter, raising seven distinct challenges.  (Sientra Mem. 12-19.)  First, Sientra Defendants contend that Plaintiffs impermissibly conflate Sientra with Silimed.  (Sientra Mem. 12-14.)  Second, they argue that allegations emanating from a single confidential witness do not support a strong inference of scienter.  (Sientra Mem. 14-16.)  Next, Sientra Defendants maintain that Plaintiffs fail to allege a cognizable motive, for allegations that a company covered up problems to raise money are "not probative of scienter."  (Sientra Mem. 16.)  Fourth, they contend that the stringent "core operations" doctrine is inapplicable because Plaintiffs have failed to produce specific admissions that Zeini or Pigeon had "actual access" to information about particulate contamination at Silimed.  (Sientra Mem. 16-17.)  Fifth, Sientra Defendants postulate that Plaintiffs' speculative claims that Sientra "cleaned house" do not support an inference of scienter.  (Sientra Mem. 17-18.)  Sixth, they argue that XOS certifications cannot create an inference of scienter.  (Sientra Mem. 18.)  Finally, Sientra Defendants contend that, viewed holistically, the far more compelling inference is that all Defendants took responsible steps upon

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 15-07548 SJO (RAOx)**                 **DATE:   June 9, 2016**

receiving material information regarding issues with Silimed, particularly in light of the fact that Individual Defendants alone lost millions in stock value by holding onto their shares during the Class Period.  (Sientra Mem. 18-19.)

"A defendant who makes misrepresentations or omissions 'either intentionally or with deliberate recklessness' acts with scienter."  *OPERF*, 774 F.3d at 607 (citing *In re Daou Sys.*, 411 F.3d at 1015).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 127 S. Ct. 2499 (2007).  The complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

This does not mean that a plaintiff must "plead more than she would be required to prove at trial."  *Id.* at 311.  Rather, "[a] plaintiff alleging fraud under § 10(b) action . . . must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference."  *Id.*

> Under *Tellabs* and Ninth Circuit law, we conduct a two-part inquiry to determine whether scienter has been adequately pled:  first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (internal citations omitted).

"Where . . . the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, [the Ninth Circuit] require[s] that the Plaintiffs allege scienter with respect to each of the individual defendants."  *OPERF*, 774 F.3d at 607 (citing *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743-44 (9th Cir. 2008)).  Scienter may be imputed "to individual defendants in some situations, for example, where we find that 'a company's public statements [are] so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.'"  *Id.* at 607-08 (quoting *Glazer*, 549 F.3d at 744).

For the reasons discussed below, the Court disagrees with Sientra Defendants that the CAC fails to allege sufficient facts to create a strong inference that Sientra, Zeini, and Pigeon made misleading statements in the Registration Statement and Prospectus regarding the regulatory issues present at Silimed's Rio De Janiero facility either intentionally or with deliberate recklessness.  The Court finds this case to be similar in many material respects to *Berson v. Applied Signal Tech., Inc.*, a case in which the Ninth Circuit Court of Appeals  reversed the district court's dismissal of section 10(b) and Rule 10b-5 claims premised on defendant Applied Signal's allegedly misleading practice of counting as a "backlog" contracted work not yet performed but for

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 15-07548 SJO (RAOx)**          **DATE: June 9, 2016**

which a dollar value was reported, without disclosing that "backlog" included tens of millions of halted contract work for which agencies had issued stop-work orders. 527 F.3d 982 (9th Cir. 2008). The Ninth Circuit held that the existence and effect of the stop-work orders were alleged with sufficient particularity, that the reporting of backlog would have mislead reasonable investors, and that scienter of Applied Medical's top managers was also alleged with sufficient particularity. *Id.* at 985-89.

Here, as in *Berson*, Plaintiffs "allege no particular facts indicating that [Sientra, Zeini, or Pigeon] actually knew about the [regulatory issues faced by Silimed]. Instead, [P]laintiffs **infer** that these high-level managers must have known about the [regulatory issues] because of their devastating effect on the corporation's revenue." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (emphasis in original). In *Berson*, the Ninth Circuit analogized to another case, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West*, 320 F.3d 920 (9th Cir. 2003), in which the plaintiffs, instead of particularized allegations, "relied on an inference based on defendants' position as outside directors on America West's board," concluding that given "[t]he company's maintenance problems, and the government's investigation into them, were so important to the company . . . it was 'absurd to suggest that the Board of Directors would not discuss' them." *Berson*, 527 F.3d at 988 (quoting *Am. West*, 943 n. 21). Similarly, Plaintiffs in this case ask the Court to infer knowledge or recklessness from the critical importance of Silimed's operations to Sientra's own financial condition.

The Court acknowledges that this case is arguably distinguishable from *Berson* on two grounds, for reasons pointed out by Sientra Defendants in slightly different contexts. First, unlike in *Berson*, where the defendant, Applied Signal, itself received stop-work orders, in this case, Silimed, a separate company from Sientra, was the entity facing regulatory challenges. *Cf. Berson*, 527 F.3d at 987-88. Second, in *Berson*, the stop-work orders were already in effect when the allegedly misleading statements were made; this is unlike the instant case, in which Brazil's health regulator, ANVISA, did not halt Silimed's manufacturing operations until after Sientra made the challenged statements.

The Court nevertheless concludes that the presence of these two possible distinguishing factors does not negate the strong inference of scienter in this case. First, Plaintiffs allege a number of facts establishing a strong connection between Sientra and its exclusive manufacturer, Silimed. Based on these factual allegations, a strong inference can be drawn that Sientra knew or should have known about significant quality control problems that threatened, and ultimately halted, Silimed's manufacturing operations. Plaintiffs allege that Sientra in its 2014 10-K stated that "we [Sientra, not Silimed] are primarily responsible for the manufacturing and quality assurance of our products," and that "[w]hen we receive products from Silimed, we inspect the products prior to shipping them to our customers." (CAC ¶ 123.) Plaintiffs further allege that Sientra's Quality Assurance department fielded complaints relating to poor quality control processes at the Silimed plant, and further that Zeini, Pigeon, and the Quality Control team not only communicated with Silimed regarding quality control issues, but also performed multiple on-site inspections of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

Silimed's manufacturing facilities.[7]  (CAC ¶¶ 63, 94-95, 97.)  Indeed, Plaintiffs' confidential witness stated that since Sientra contracted with Silimed, it was important that Sientra monitor Silimed's manufacturing processes to ensure they met the relevant standards for production and quality control.[8]  (CAC ¶ 98.)  Perhaps the most revealing of all, however, is the allegation that by no later than September 4, 2015, Silimed's "in-house" investigation that spawned from an earlier German investigation **independently confirmed** the presence of particle contamination on the surface of breast implants sold in the United States by Sientra.  (CAC ¶¶ 68-74, 81, 87-88; Blair Decl., Ex. 10 ("Experian Rep.") 3, 5, ECF No. 72-12.)  This investigation concluded weeks before Sientra filed its Registration Statement and Prospectus.  (CAC ¶¶  90, 130.)

Plaintiffs' own allegation that Sientra made the challenged statements before Silimed was forced to cease its manufacturing operations is likewise not fatal to their case, for a strong inference can be drawn that Silimed's compliance with applicable regulations and GMPs was critical to Sientra's business operations.  Plaintiffs allege that the contamination of Silimed's silicone products directly affected the commercial viability of Sientra's breast implants, which accounted for all of its net sales.  (CAC ¶¶ 45, 142-43, 148.)  Indeed, Sientra suspended sales of its breast implants and warned doctors not to use them, indicating that Sientra believed the contamination posed a health, or at the very least a financial, risk.  (CAC ¶¶ 142-43.)

Plaintiffs further allege with particularity that Zeini and Pigeon, both of whom held large amounts of Sientra shares, were motivated to conceal the contamination at the Silimed plant from investors so that they could raise enough money in the SPO to keep Sientra afloat and prevent a default on its loan with Oxford.  (CAC ¶¶ 6, 60.)  Because failure to successfully raise capital through the SPO threatened to eradicate the value of Zeini and Pigeon's shares, the Court finds that this potential for motive increasers the strength of the inference that Zeini and Pigeon acted with scienter.  *See In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 U.S. Dist. LEXIS 20214, at *36-37 (N.D. Cal. Aug. 10, 2005) (allegations that "defendants were motivated to inflate artificially [their company's] stock price in the short term . . . and obtain much-needed capital" through a secondary offering evidenced "a palpable motive for fraud" that was "stronger than the generic 'desire to raise capital' which can be attributed to every company"); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1071-72 (N.D. Cal. 2002) (allegations that company was motivated to raise money to maintain compliance with loan covenants were "sufficiently concrete" and "particular" to raise a strong inference of scienter).  Sientra Defendants' suggestion that the

---

[7]  That these inspections allegedly took place between 2012 and 2014—before the investigations into Silimed's plant commenced—is beside the point, as Plaintiffs allege the confidential witness stopped working for Sientra in 2014.  (CAC ¶ 93.)

[8]  Although it is true that Plaintiffs do not allege with particularity how or why the confidential witness had personal knowledge regarding Zeini and Pigeon's activities, the Court finds that Plaintiffs have included sufficient allegations to demonstrate why the witness knew that it was important for Sientra to monitor Silimed's manufacturing process.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:   CV 15-07548 SJO (RAOx)          DATE:   June 9, 2016

lack of insider stock sales by Zeini and Pigeon negates scienter is contrary to controlling case law. *See Am. West*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *Tellabs*, 551 U.S. at 325 (lack of insider stock sales is not fatal to scienter).

The close temporal proximity between (1) the filing of the Registration Statement and Prospectus; (2) the closing of the SPO; and (3) the MHRA press release announcing the suspension of sales of Silimed's silicone implants further supports a strong inference of scienter, particularly where Zeini and underwriters Piper Jaffray and Stifel Nicolaus requested acceleration of the Registration Statement's effective date.  (*See* CAC ¶¶ 78-80, 90-92.)  Indeed, "[t]emporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."  *Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014); *see also Berson*, 527 F.3d at 988 n. 5 (temporal proximity "'bolster[s]' the inference" of scienter); *Cooper v. Pickett*, 137 F. 3d 616, 626 (9th Cir. 1997) (circumstantial evidence of  scienter based on temporal proximity "mounts" with the allegations that, at the time false statements were made, the company's "need for the proceeds from a stock offering was great").

Even if Plaintiffs' direct and motive-based allegations regarding Zeini and Pigeon's knowledge of Silimed's regulatory challenges were insufficiently particularized, the Court would nevertheless conclude that Plaintiffs have alleged sufficient facts to trigger the application of the "core operations" doctrine.  "Under that theory, scienter may be imputed 'based on the inference that key officers have knowledge of the "core operations" of the company.'"  *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014) (quoting *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014)).  "Specifically, in 'rare circumstances' allegations regarding management's role 'may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.'"  *Id.* (quoting *Reese*, 747 F.3d at 576).

In *Mulligan*, the district court concluded that "it is 'absurd' to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions—the heart of a company whose main business is manufacturing pharmaceuticals for public consumption."  36 F. Supp. 3d at 970.  The same holds true here.  Given the importance of manufacturing and quality control to the success of [Sientra] and the fact that both areas of operation had been flagged by [several regulatory agencies], it is a logical, and strong, inference that [Sientra, Zeini, and Pigeon] were aware of the alleged severe and pervasive problems in [Silimed's Rio De Janiero] facility."  *Id.* Sientra Defendants' efforts to disentangle Sientra from its sole manufacturer are unavailing for the reasons discussed above.

Sientra Defendants finally contend that, viewed holistically, the stronger inference to be drawn is that Sientra and its executives acted diligently in withdrawing their products from the market upon receipt of reliable information demonstrating a potential problem, citing this Court's opinion in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

*Kairalla*.  (Sientra Mem. 18-19.)  Although Plaintiffs' allegations do indicate that Sientra disclosed decisions by European and Brazilian regulators to halt sales of Silimed's products in a somewhat timely manner, Plaintiffs have alleged that Defendants filed the Registration Statement and Prospectus—and, indeed, pressed the SEC to accelerate the effective date of the Registration Statement—without revealing that the "risks" of compliance-related issues had in fact materialized. Plaintiffs further allege that Defendants sought the SPO in part to repay the Oxford loan on which they had defaulted.  The Court concludes that the stronger inference based on these allegations is that Sientra, Zeini, and Pigeon either intentionally or recklessly concealed material information from Sientra's investors and the public through the Registration Statement and Prospectus.

The inference of scienter—and indeed of falsity or misleadingness—is far weaker with respect to the statements contained in Sientra's Q1 and Q2 Form 10-Qs.  These documents were filed well before Silimed's internal investigation confirmed the presence of particle contamination on the surface of breast implants and before the ZLG temporarily suspended Silimed's CE.  (CAC ¶¶ 7, 74, 81.)  Thus, to the extent these risk-related statements are material, Plaintiffs have failed to allege sufficient facts to support a "strong inference" that Sientra, Zeini, Pigeon, or anyone else intentionally or recklessly mislead investors and the public through the statements in the Q1 and Q2 Form 10-Qs.

Accordingly, the Court concludes that Plaintiffs have sufficiently alleged a strong inference of scienter as to Sientra, Zeini, and Pigeon with respect to the statements contained in the Registration Statement and Prospectus, and therefore **DENIES** the Sientra Motion on this basis. The Court finds, however, that Plaintiffs have failed to sufficiently allege that these defendants acted with scienter with respect to the statements contained in Sientra's Q1 and Q2 Form 10-Qs.

### 3.    Loss Causation

Sientra Defendants next contend that Plaintiffs fail to adequately allege loss causation, which is an element of a section 10(b) claim and provides an affirmative defense for section 11 claims. (*See* Sientra Mem. 19-20.)

"Loss causation is simply 'a causal connection between the material misrepresentation and the loss.'"  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *Dura Pharms.*, 544 U.S. at 342).  "Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.'"  *Id.* (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007)).  Although there has been some debate regarding whether loss causation must be pled with particularity, the Ninth Circuit recently held that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation."  *OPERF*, 774 F.3d at 605.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.: CV 15-07548 SJO (RAOx)          DATE: June 9, 2016**

The Court finds that Plaintiffs have adequately alleged loss causation, at least with respect to the statements contained in the Registration Statement and Prospectus. As noted above, Plaintiffs allege these filings, which were submitted to the SEC in connection with Sientra's pursuit of the SPO, stated, among other things, "risks" associated with utilizing a Brazilian manufacturer without disclosing that these risks had in fact come to fruition. As noted by the Second Circuit in several cases,

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (quoting *Castellano v. Young & Rubicam*, 257 F.3d 171, 188 (2d Cir. 2001)). In this case, Plaintiffs sufficiently allege that Sientra earned significant capital through the SPO by concealing information regarding significant contamination and regulatory issues facing Silimed, Sientra's sole manufacturer. Plaintiffs further allege that Sientra's statements in its Registration Statement and Prospectus regarding the "risks" of such problems would "cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud." Plaintiffs also allege in the CAC that once the risk of the manufacturing issues materialized, it caused Sientra's shares to plummet by nearly 81% between September 23, 2015 and October 29, 2015. (CAC ¶¶ 134, 140, 142, 146.) These misstatements and omissions thus "concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 548 (N.D. Cal. 2009) (internal citation omitted).

Accordingly, the Court **DENIES** the Sientra Motion on this basis.

          4.     "Control Person"

Plaintiffs allege in the CAC that the Individual Defendants are liable as "control persons" of Sientra under section 15(a), while Zeini and Pigeon are liable as "control persons" of Sientra under section 20. (*See* CAC ¶¶ 181-187, 197-202.) Sientra Defendants contend that these claims are inadequately pled, arguing that Plaintiffs fail to plead facts demonstrating that Individual Defendants "exerted actual control" and were culpable participants in the alleged violations. (Sientra Mem. 20.)

"Plaintiff need not show that the defendant was a culpable participant in the violation [to prove the defendant is a 'controlling person' under section 15(a) or section 20], but defendant may assert a 'good faith' defense." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)). "Thus, in order to make out

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)            DATE:  June 9, 2016**

a prima facie case, it is not necessary to show actual participation or the exercise of actual power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Id.* "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.*

With respect to Zeini and Pigeon, the Court concludes that the CAC contains sufficient factual allegations to demonstrate that these defendants had the ability to control the content and dissemination of false and misleading statements.  (*See* CAC ¶¶ 29-30, 78, 94, 97, 105, 108-09, 117, 127, 148-49.)  Thus, the Court **DENIES** the Sientra Motion on this basis.

With respect to the remaining Individual Defendants, however, the CAC contains no allegations that these individuals had any "participation of the day-to-day affairs of the corporation," and indeed is devoid of any factual allegations concerning these individuals other than that they were directors of Sientra at the time of the SPO.  (*See* CAC ¶¶ 31-35.)  Although Plaintiffs have submitted a declaration indicating that each signed the Registration Statement, and thus were responsible for the false and misleading statements therein under section 11, no such allegation appears in the CAC, Plaintiffs' operative pleading.  Accordingly, the Court **GRANTS IN PART** the Sientra Motion and **DISMISSES** Plaintiffs' Section 15 claim as to defendants Simon, Haines, Greer, O'Boyle, and Nugent with leave to amend.

      5.      Securities Act Claims

          a.      Rule 8 Governs Plaintiffs' Section 11, 12, and 15 Claims

The Court concludes that Plaintiffs' Securities Act claims do not sound in fraud and are subject to Rule 8, not Rule 9(b).  Like the plaintiffs in both *In re Countrywide Corp. Sec. Litig.* and *In re CytRx Corp. Sec. Litig.*, Plaintiffs have "stripped" their Securities Act allegations of fraud and only "levie[d] fraud allegations against a select few defendants" based upon "specifie[d] unique, particularized facts as to those defendants."  *See In re CytRx Corp.*, 2015 U.S. Dist. LEXIS 91447, at *48 (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 558 F. Supp. 2d 1132, 1162-63 (C.D. Cal. 2008)).  Indeed, Plaintiffs allege that Underwriter Defendants failed to conduct a reasonable investigation or did not possess a reasonable basis for the belief that the statements contained in the Registration Statement were true, were without omissions of material fact, and were not misleading.  (CAC ¶ 168.)  Thus, the Court concludes that Plaintiffs' Securities Act claims—i.e. their Section 11 and Section 12 Claims—need only meet the standards imposed by Rule 8.

          b.      Quad Has Standing to Assert Section 11 and 12 Claims

In the Underwriter Motion, Underwriter Defendants principally contend that Plaintiffs' Section 11 and Section 12 claims must be dismissed because the CAC does not allege that either named plaintiff—Flynn or Quad—has statutory standing to assert Securities Act claims arising from the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)**          **DATE:  June 9, 2016**

SPO.  (Underwriter Mem. 3-5.)  For the reasons set forth below, the Court disagrees, and thus **DENIES** the Underwriter Motion on this basis.

> i.          Quad Has Standing to Assert Its Section 11 Claim

Section 11 confers standing on "any person" that acquires securities pursuant to, or traceable to, a materially false or misleading registration statement.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).  Where, as here, there is a secondary offering, "plaintiffs would need to prove that the shares they purchased came from the pool of shares issued in the secondary offering, rather than from the pool of previously issued shares."  *Id.*  One method plaintiffs can use to demonstrate that their shares "came from the pool of shares issued in the secondary offering" is by "prov[ing] that they purchased their shares directly in the secondary offering itself."  *Id.*

Plaintiffs allege in their CAC, which incorporates Quad's Certification filed in connection with the motion for appointment as lead plaintiff, that Quad purchased shares of Sientra on September 18, 2015, the date of the SPO, at the offering price of $22.00 per share.  (*See* CAC ¶¶ 27, 90; Decl. Lesley F. Portnoy in Supp. Mot. for Appointment of Counsel and Lead Pl., Ex. B at 10, ECF No. 36-2.)  This is sufficient to demonstrate that Quad "purchased [its] shares directly in the secondary offering itself."  *Century Aluminum*, 729 F.3d at 1106; *see also In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 U.S. Dist. LEXIS 91447, at *50 (C.D. Cal. July 13, 2015) (holding that plaintiffs met their burden as to standing when the "purchased shares during the offering period at the secondary offering price").

> ii.          Quad Has Standing to Assert Its Section 12 Claim

Unlike section 11, "[s]ection 12 expressly limits recovery to only those purchasers who purchase their shares from a seller who makes use of false or misleading statements."  *In re CytRx Corp.*, 2015 U.S. Dist. LEXIS 91447, at *46-47 (citing 15 U.S.C. § 77*l*(a)(2) (seller "shall be liable to the person purchasing such security from him")).  Moreover, section 12(a)(2) limits liability to persons who "offer[ ] or sell[ ] a security" by means of a false or misleading "prospectus or oral communication . . . to the person purchasing such security from him."  15 U.S.C. § 77*l*(a)(2).  "A person 'offers or sells' a security within the meaning of § 12(a)(2) if the person either:  (1) passes title to the securities to the plaintiff, or (2) solicits the purchase, motivated in part by his own financial interests."  *In re DDi Corp. Sec. Litig.*, No. CV 03-7063 NM (SJHx), 2005 U.S. Dist. LEXIS 28216, *61 (C.D. Cal. July 20, 2005) (citations omitted).  Where, as here, Rule 8, rather than Rule 9(b) applies, plaintiffs "must provide a short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them."  *Id.* at *66 (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996)).  Here, Plaintiffs allege that Underwriter Defendants "offered, promoted, and sold Sientra common stock in the SPO" and that Quad purchased shares as part of the SPO.  (CAC ¶¶ 36-39, 175.)  Accordingly, the Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 15-07548 SJO (RAOx)          DATE:  June 9, 2016**

concludes that Quad has standing to assert the Section 12 Claim, and further finds that the CAC contains sufficient allegations to state a section 12 claim against Underwriter Defendants.

           c.          <u>Plaintiffs' Section 15 Claim Fails As to Underwriter Defendants</u>

Underwriter Defendants finally argue that Plaintiffs have failed to state a section 15 claim as to them because the CAC lacks any allegations regarding Underwriter Defendants.  (Underwriter Mem. 5-6.)    Plaintiffs agree that their section 15 claim "is **not** being asserted against the Underwriter Defendants," and aver that there was a "typographical error in the heading of that cause of action.  (Underwriter Opp'n 1 n. 2 [emphasis in original[.)  Thus, the Court **GRANTS IN PART** the Underwriter Motion and **DISMISSES** Plaintiffs' Section 15 Claim as to Underwriter Defendants with prejudice.

III.        <u>RULING</u>

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Sientra Defendants' Motion to Dismiss the Consolidated Amended Complaint and **GRANTS IN PART** and **DENIES IN PART** Underwriter Defendants Motion to Dismiss and Joinder in Sientra Defendants' Motion to Dismiss Consolidated Amended Complaint.  Should Plaintiffs choose to further amend their operative pleading, they may do so by filing a Consolidated Second Amended Complaint against Defendants within fourteen (14) days of the issuance of this Order.  Defendants will have fourteen (14) days from either the date Plaintiffs file such an amended pleading or the expiration of this fourteen-day period to respond.

IT IS SO ORDERED.